IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Gregory Baker, | ) |
| | ) Case No. 13 C 50193 |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Wexford Health Sources, Inc., et al., | ) Judge Philip G. Reinhard |
| | ) |
| Defendants. | ) |

## ORDER

For the reasons stated below, the defendants' motion to strike [106] is denied and defendants' motion for summary judgment [86] is granted as to Dr. Dominguez and Dr. Funk and granted in part and denied in part with regard to Wexford. The parties are directed to contact Magistrate Judge Iain Johnston's chambers by August 24, 2015 to arrange for a settlement conference with regard to the remaining claims.

## STATEMENT - OPINION

On March 2, 2015, defendants Wexford Health Sources, Inc., Dr. Bessie Dominguez, and Dr. Arthur Funk filed a joint motion for summary judgment [86], as well as their memorandum in support [91], Local Rule 56.1(a)(3) statement of facts [87], and corresponding exhibits [88-90]. On April 7, 2015, plaintiff Gregory Baker filed his response [95], Rule 56.1(b)(3)(A)-(B) response to defendants' statement of facts [96], and Local Rule 56.1(b)(3)(C) statement of additional facts [97]. On May 6, 2015, defendants filed their reply [102] and response to plaintiff's statement of additional facts [101]. The court granted plaintiff's motion to file a surreply, which plaintiff filed on May 11, 2015 [108]. Defendants filed a motion to strike plaintiff's motion for leave to file a surreply [106], which is hereby denied as moot. Defendants also filed a motion for leave to file a sur-surreply, which the court denied [112]. Defendants' motion for summary judgment is now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after

1

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Prior to addressing the merits of defendants' motion, it is necessary to set forth the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact, as well as plaintiff's version of relevant disputed facts. In addition, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to plaintiff and does so accordingly. *See Schepers*, 691 F.3d at 913.

## A. FACTUAL BACKGROUND.

At all relevant times, plaintiff Gregory Baker was incarcerated at the Dixon Correctional Center in Dixon, Illinois.[1] [96] at ¶ 3. At all relevant times, Wexford Health Sources, Inc. contracted with the IDOC to provide medical services to inmates at various IDOC prisons, including Dixon. [96] at ¶ 4. In 2011 and 2012, medical staff at Dixon included a medical director, a staff physician, a physician's assistant, and twenty to thirty nurses. [96] at ¶ 72. Dr. Bessie Dominguez was employed during the relevant time as the site physician at Dixon, practicing general medicine and providing medical services to inmates. [96] at ¶ 5. Dr. Arthur Funk was employed during the relevant time as Wexford's Regional Medical Director for the northern region of Illinois, which includes Dixon. [96] at ¶ 6.

The parties dispute the date of plaintiff's injury. According to plaintiff, on July 11, 2011, plaintiff was assigned a work detail in the dietary unit of Dixon, cleaning pots and pans. [96] at ¶¶ 9-10. He was asked by his supervisor, Darla Habben, to help another inmate unload a food "hotbox" from a van. *Id.* While attempting to unload the box, he lost control and it fell on his right hand and arm. *Id.* He grabbed his arm after the incident and informed Habben what had occurred at approximately 1:30 p.m., but continued working throughout the day cleaning pots and pans. [97-2] at 7; [96] at ¶ 11.

When he woke up on July 12, 2011, plaintiff "couldn't get out of bed" because his arm and hands were badly swollen. [97-2] at 7. He observed that he had "a big knot" at the top of his right arm and that "from my hand up to my arm it was swollen. My fingers were swollen and stuff. And I knew something was wrong, because I couldn't turn my hand over." [97-2] at 14-15. In order to turn his hand, he needed to turn his elbow rather than his wrist. [97-2] at 16.

Plaintiff asked an officer if he could be taken to the healthcare service and was informed that he would need to sign up for sick call. [97-2] at 7-8. At work that day, he showed Habben the swelling and "she looked like, whoa, this is pretty swollen up." [97-2] at 8. When he asked her to take him to Health Services, she consulted with Cynthia Eykamp, a Public Service

---

[1]Plaintiff has since been released from the custody of the Illinois Department of Corrections.

2

Administrator at Dixon, who instructed that plaintiff put ice on his arm and sign up for sick call. *Id.*; [101] at ¶ 1. After work, plaintiff signed up for sick call to be seen the next day, on July 13th. [97-2] at 17.

Plaintiff testified that at one point after he informed her of the incident, Habben informed him that she did not want to fill out an incident report and that he was "going to mess up [her] vacation time, you know, messing around with the incident reports[.]" [97-2] at 14. Habben signed an incident report on July 26, 2011, stating that the incident occurred on July 25, 2011. [97-2] at 12; [101] at ¶ 2.

On July 13, 2011, plaintiff went to sick call and explained the incident and his symptoms to "Nurse Katie," [97-2] at 18, referred to by Dr. Dominguez as Nurse Cady. *See* [87-2] at 16, 19. Nurse Cady attempted to have plaintiff seen by a physician, but according to plaintiff "by that time there, I guess it was short-staffed or something or a lot of people was going on vacations or whatever, you know, so it was like short-staffed or something." [97-2] at 18. Because of this, "she said because there wasn't a lot of people there that help or whatever, so she gave me some aspirin and an Ace bandage. And she just told me that she would put me on the list to see the doctor due to the fact there's a shortage[.]" [97-2] at 18. It is undisputed that it was Wexford's custom and practice to list any time that a patient presented to sick call, and that no record reflects that plaintiff presented to sick call on July 13, 2011. *See* [96] at ¶¶ 10, 61. Dr. Dominguez testified that she could not recall if she or any other medical staff were on vacation in July of 2011. [96] at ¶ 72.

Plaintiff was called back to Health Services on August 1, 2011, at which time he again spoke to Nurse Cady, who recognized him from his previous visit and referred him to Dr. Dominguez for an examination on August 2, 2011. [97-2] at 20; [96] at ¶ 12.

Plaintiff first saw Dr. Dominguez on August 2, 2011, at which time he explained the incident and his resulting symptoms. [96] at ¶ 13. She examined his arm and determined that the right wrist was swollen and had a decreased range of motion. Defendant testified that the knot on the top of his right arm was visible at the time of the examination. [97-2] at 21. She opined that "it looked liked a nice little sprain" and diagnosed plaintiff with a right wrist injury. *Id.* She also wrapped his wrist up to the middle arm in an ACE bandage, prescribed him 600 milligrams of ibuprofen, and directed him to keep his arm elevated. [97-2] at 21-22; [96] at ¶ 14.

Dr. Dominguez also ordered x-rays of plaintiff's wrist to rule out a fracture. The x-rays were performed at Dixon on August 2, 2011 and delivered to OneRadiology, which reviewed the films and completed an x-ray report on August 3, 2011. [87-2] at 14, 40. However, the OneRadiology x-ray report was not reviewed by a Wexford physician at that time. Plaintiff signed up for sick call on August 8, 2011, at which time the medical chart notes that he was "asking questions about wrist." [87-2] at 15. On August 10, 2011, Dr. Jill Wahl, traveling medical director, reviewed the OneRadiology x-ray report, noted an "abnormal right wrist x-ray," and ordered that plaintiff follow up with Dr. Dominguez. *Id.*; [96] at ¶ 15. Dr. Dominguez

3

testified that Wexford's policy at the time was that "the medical director got all the x-rays and lab reports" which could at times cause delays in treatment if the medical director was unavailable on the day that the x-ray results became available. [87-2] at 15, 17.

Plaintiff was seen by Dr. Dominguez on August 12, 2011, at which time she examined him, discussed the x-ray findings showing a mildly separated ulna, and opined that plaintiff had a right ulnar tip dislocation. [96] at ¶ 16. Dr. Dominguez submitted a referral request to Wexford's collegial review board in an effort to obtain a consultation for him with an outside specialist. *Id.* The August 15, 2011 collegial review, which Dr. Wahl participated in, denied the referral request based on the totality of the evidence and recommended conservative treatment for plaintiff's wrist. *Id.* Dr. Wahl discussed the decision with Dr. Dominguez on August 15, 2011, and Dr. Dominguez scheduled a re-evaluation and repeat x-ray for plaintiff. *Id.*

On August 17, 2011, plaintiff filed an emergency grievance regarding the referral request and complained that he was not receiving adequate medical treatment for his "hand wrist, and arm [which was] still in overwhelming pain" and he believed he had "nerve damage and a fractured bone." [101] at ¶ 8.

On August 24, 2011, Dr. Dominguez examined plaintiff for a third time and ordered a repeat x-ray of his wrist, which continued to show an ulna separation. [96] at ¶ 17. The examination revealed that while plaintiff's swelling had improved, part of plaintiff's right ulna "was prominently sticking out," he continued to have right wrist pain, and "his range of motion was still so limited." *Id.* Dr. Dominguez re-wrapped plaintiff's ACE bandage and informed him how to fill the prescription for his pain and anti-inflammatory medication. *Id.*

On September 9, 2011, Dr. Dominguez examined plaintiff for a fourth time, at which time the knot on his arm was still visible, he continued to complain of pain, and his range of motion remained limited. [96] at ¶ 18. She ordered additional x-rays and determined that plaintiff should be referred to the regional medical director, Dr. Funk, for a possible second opinion on an orthopedic referral "ASAP." [87-2] at 20. This was "[b]ecause it's been kind of like a month of follow-up, and I wasn't seeing any improvement." *Id.* Due to her own referral request being denied, Dr. Dominguez testified that her plan was to obtain a second opinion from Dr. Funk, "or what I'm hoping is that he will appeal that and hopefully get it going, considering it's been a month." *Id.*; [96] at ¶ 18. When asked if a month of follow up was unusual or typical, Dr. Dominguez testified that it was "[k]ind of typical. I kind of get impatient." [87-2] at 20; [96] at ¶ 18. Plaintiff was scheduled to be seen by Dr. Funk on September 22, 2011. [96] at ¶ 18.

On September 11, 2011, plaintiff received a denial of his emergency grievance, purportedly from Warden Chandler, determining that his condition was not an emergency. [101] at ¶ 11. Later that day, plaintiff spoke to Warden Chandler and showed his injury to her. *Id.* Chandler agreed that his wrist looked twisted and spoke to Dr. Funk in the healthcare unit to request that plaintiff be seen. *Id.* Dr. Funk rescheduled plaintiff's appointment and examined him on September 12, 2011. [96] at ¶ 18. Dr. Funk noted the knot on plaintiff's arm, as well as

4

continuing pain in his wrist and limitation in his range of movement. [96] at ¶ 19. He approved a thirty-day lay in and explained to plaintiff that he would be requesting an expedited referral to an orthopedic specialist. *Id.* On September 13, 2011, Dr. Funk participated in collegial review and plaintiff was approved for an expedited independent orthopedic consultation, which was scheduled for September 27, 2011. [96] at ¶ 20. It is undisputed that when a referral for an outside specialist is approved, Wexford's practice is to schedule an appointment within one day. [96] at ¶ 71.

On September 27, 2011, plaintiff was taken to KSB Hospital in Dixon, Illinois, and was examined by Dr. Gabriel, a general orthopedic physician. [96] at ¶ 21. Dr. Gabriel reviewed x-rays of plaintiff's wrist which had been taken at Dixon Correctional. [96] at ¶ 22. He determined based on the x-rays and a physical examination of plaintiff that plaintiff had a fracture farther up his arm. *Id.* Dr. Gabriel ordered x-rays of plaintiff's forearm, which revealed a fracture that he described as at least six to eight weeks old. *Id.*

Dr. Gabriel asked the guards accompanying plaintiff why he had been referred so late. [101] at ¶ 13. Dr. Gabriel testified that he would have treated the fracture acutely if he had seen plaintiff closer to the time of the incident. [88] at 15. However, as time went on and the fracture began to heal, it would require more complicated reconstructive surgery by a specialist. *Id.* Because plaintiff's fracture could no longer be treated on an acute basis, Dr. Gabriel referred him to a hand orthopedic specialist at the University of Illinois Chicago ("UIC") for possible reconstructive surgery. Because the fracture could no longer be treated acutely, Dr. Gabriel testified that the injury was no longer emergent and there was no particular timeframe in which the surgery would need to occur. [96] at ¶ 24. He testified that "you don't want it to go six months or anything[,]" but that even after six months it could still be worked on. [101] at ¶ 13. When asked for the threshold time period in which he would move from treating the fracture acutely to referring it to a specialist, he testified "if I'm thinking here out loud, at what point would I have gone from I'll take care of this to refer it? You know, a month or so. For sure six weeks. But something like that." [88] at 15. When asked whether a delay in treatment could have exacerbated plaintiff's injury, Dr. Gabriel testified that it was possible, but also that with plaintiff's injury he could suffer continuing mobility problems even if he treated it immediately after the injury. [96] at ¶ 24.

After Dr. Gabriel's examination and referral, Dr. Funk and Wexford's utilization management approved plaintiff to see a hand orthopedic specialist at UIC, and an appointment was scheduled for November 21, 2011. [96] at ¶¶ 26-28. Dr. Funk also ordered a three-month lay in for plaintiff, ordered additional x-rays, prescribed additional pain medications, and ordered that plaintiff be placed in an Ace wrap, although the parties dispute whether plaintiff in fact received an Ace wrap. *Id.*

On November 21, 2011, plaintiff was taken to UIC. [96] at ¶ 29. Due to mis-communication within UIC as to whether plaintiff required an upper extremity or knee specialist, plaintiff was examined by Dr. Chmell, an orthopedic surgeon who specializes in knee problems

5

rather than upper extremities. [96] at ¶¶ 29-31. Dr. Chmell performed x-rays and referred plaintiff to Dr. Meija, a hand specialist. *Id.* Dr. Chmell testified that urgent surgery was not required and that plaintiff's condition would be unchanged between November 21, 2011 and February 13, 2012, when plaintiff's next appointment was scheduled. *Id.*

Following Dr. Chmell's examination and referral, Dr. Funk and Wexford's utilization management approved plaintiff to see Dr. Meija for an examination and possible surgery. [96] at ¶¶ 32-36. Dr. Funk was notified that UIC had scheduled plaintiff for an appointment on February 13, 2012, and according to plaintiff's medical chart Dr. Funk responded that "that was gonna have to work." [101] at ¶ 18. During this time period, plaintiff drafted a letter complaining that he had been given insufficient treatment for his injury, which risk management forwarded to Dr. Funk. [96] at ¶ 34. Wexford ultimately responded to plaintiff that he had been referred for further medical treatment and was going to be scheduled to be seen again in the near future. *Id.*

Also during this time period, plaintiff presented to sick call on multiple occasions and was seen by Dr. Dominguez on several occasions. On January 27, 2012, plaintiff was examined by Dr. Dominguez, complaining of pain and numbness. [96] at ¶¶ 32-36. In response, Dr. Dominguez prescribed new medications for his pain and numbness. *Id.*

On February 13, 2012, plaintiff was taken to UIC for his appointment with Dr. Meija. [96] at ¶ 37. However, UIC cancelled the appointment that day and plaintiff was not seen by any physician. *Id.* UIC originally rescheduled plaintiff's appointment for April 5, 2012. *Id.* After Wexford staff intervened and requested an earlier date, the appointment was rescheduled to March 29, 2012. *Id.* During an appointment with Dr. Dominguez, plaintiff's pain medications were continued and Dr. Dominguez noted in her chart that plaintiff was "unfortunately not seen" during his last UIC visit. [96] at ¶ 38; [101] at ¶¶ 22-23. In a March 19, 2012 letter to the Illinois Attorney General's office, Wexford staff noted that Wexford was aware of the continuing delay in treating plaintiff's injury, but "unfortunately by the time a diagnosis was made time was no longer a factor" and Wexford was attempting to expedite referrals. [101] at ¶ 23.

On March 29, 2012, plaintiff was taken to UIC and examined by Dr. Meija. [96] at ¶¶ 39-40. Dr. Meija recommended and planned reconstructive surgery to repair the fracture. *Id.* Dr. Funk and Wexford's utilization management approved plaintiff for surgery. [96] at ¶¶ 41, 43. UIC originally scheduled plaintiff for surgery on April 20, 2012, but cancelled and rescheduled to May 12, 2012. *Id.* While awaiting surgery, plaintiff was again seen by Dr. Dominguez, who prescribed him additional pain medications. [96] at ¶ 42.

On May 12, 2012, Dr. Meija performed a surgical reconstruction to repair plaintiff's arm. [96] at ¶ 44. Dr. Meija testified that he considered the surgery a success and that the timing was reasonable, if not remarkable, for how soon the surgery was performed after he first saw plaintiff. *Id.*

During follow-up appointments with Dr. Meija, plaintiff complained of continuing numbness to his arm. [96] at ¶¶ 45-54; [101] at ¶¶ 27-33. Dr. Meija opined that this numbness was potentially related to the delay between plaintiff's injury and surgery, but that it also could have been independent of the delay or caused by a separate injury. *Id.*

## B. ANALYSIS

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Perez v. Fenoglio*, __ F.3d __ , 2015 WL 4092294, at *3 (7th Cir. July 7, 2015) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir.2009)) (internal quotations omitted). "To state an Eighth Amendment claim based on deficient medical care, a plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition." *Perez*, 2015 WL 4092294, at *3. Here, because there is no dispute that plaintiff's fractured arm constituted an objectively serious medical condition, the only issue is whether plaintiff has raised a genuine issue of material fact as to whether the defendants' actions constituted deliberate indifference. *See id.*[2]

"Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (plaintiff must show that officials are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference.")). "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." *Perez*, 2015 WL 4092294, at *3.

The court will conduct the foregoing analysis with regard to the claims against the named prison physicians, Dr. Dominguez and Dr. Funk, as well as the claims against Wexford, to determine if plaintiff has raised a genuine issue of fact as to whether the respective defendants were deliberately indifferent to his medical needs.

---

[2]Defendants also contend that plaintiff has failed to show causation because "there is no evidence that the alleged delay harmed Plaintiff[,]" all his pain was "associated with the injury sustained while unloading the hotbox[,]" and thus "[t]here is no genuine issue of material fact upon which a reasonable jury could conclude that Plaintiff suffered substantial harm unrelated to the initial injury as a result of the Defendant's conduct." [96] at 18. However, this argument is easily rejected because the Seventh Circuit recently found that "a delay in treatment may constitute deliberate difference if it exacerbates the inmate's injury or unnecessarily prolonged his pain." *Perez*, 2015 WL 4092294, at *8. Plaintiff's testimony is that he suffered ongoing pain for ten months awaiting surgery, and thus the fact that plaintiff's pain originated from his injury, rather than defendants' conduct, does not defeat causation.

7

1. The Prison Physicians – Dr. Dominguez and Dr. Funk.

Although plaintiff references several treating physicians throughout his complaint, only Dr. Dominguez and Dr. Funk are named as defendants. As a general proposition, "[p]rison physicians will be liable under the Eighth Amendment if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Perez*, 2015 WL 4092294, at *4 (quoting *Gonzales v. Feinerman*, 663 F.3d 311, 313 (7th Cir.2011)). Defendants contend that there is no genuine dispute of material fact because Dr. Dominguez and Dr. Funk at all times exercised their medical judgment to diagnose and treat plaintiff's injury, including referring him to outside orthopedic specialists and treating his symptoms with pain medication and stabilizing ACE bandages. *See* [91]. Plaintiff counters that there is a genuine dispute as to whether Dr. Dominguez and Dr. Funk were deliberately indifferent by condoning the lengthy wait times for referral approval and orthopedic appointments once scheduled. *See* [95]. Plaintiff also suggests that there is a genuine issue of material fact as to whether Dr. Dominguez and Dr. Funk were deliberately indifferent by administering ACE bandages to his injury rather than a splint or cast, which would have provided greater immobility and stability. *See* [95] at 10.

At first glance, the underlying facts of this case bear a striking resemblance to the allegations in *Perez v. Fenoglio*, in which the Seventh Circuit recently found that a plaintiff stated a claim of deliberate indifference against a Wexford prison physician. In *Perez*, as here, the plaintiff alleged a ten-month delay between suffering a serious injury to his hand and obtaining "meaningful treatment in the form of surgery." *Perez*, 2015 WL 4092294, at *5. The district court dismissed the complaint, finding that the plaintiff "had undermined any contention of deliberate indifference by 'conceding' to having received 'immediate' and 'continuing' medical attention from prison staff for his injury." *Id.* at *4. The Seventh Circuit reversed, finding that the lengthy delay between the injury and surgery supported the plaintiff's deliberate indifference claim against the prison physician. *See id.* at **4-6 ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain. Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment."). Also like this case, the plaintiff in *Perez* alleged that the prison physician only partially immobilized his injury with an ACE bandage rather than completely immobilizing it with a splint – the Seventh Circuit found that there too the plaintiff had adequately stated a deliberate indifference claim. The apparent similarities between the facts of this case and *Perez* merit a closer analysis of that decision to determine whether the two are analogous or distinguishable.

Before delving further into the Seventh Circuit's reasoning, it is important to note that *Perez* was not decided at the summary judgment stage, but rather at the pleadings stage based on the allegations in the plaintiff's *pro se* complaint. *See id.* at *3 ("Because [the plaintiff's] complaint is *pro se*, we construe it liberally, holding it to a less stringent standard than formal pleadings drafted by lawyers.") (internal quotations and alterations omitted). First, the court examined the plaintiff's allegations that the prison physician was deliberately indifferent by

delaying his treatment for a hand injury, despite knowing that the plaintiff's condition was severe and causing him ongoing pain and suffering. The court noted that the plaintiff "alleges with specificity a number of troubling delays in his treatment[,]" including the following:

> After sustaining a gaping wound and open dislocation, [the plaintiff] was forced to wait 24 hours before seeing a physician with authority to prescribe medication or suture wounds. After being seen by [the prison physician], who determined that the wound was so serious it required the care of a specialist, [the plaintiff] had to wait four days (and had to file a grievance) before being sent to [an outside specialist clinic]. By the time he arrived, it was too late for the specialist to suture the wound. After visiting the [clinic], [the plaintiff] waited seven months (and had to file another grievance) before he was returned to the clinic for follow-up care. All told, while under [the prison physician's] care, [the plaintiff] experienced a ten-month delay from the time of his injury until the time he received meaningful treatment in the form of surgery.

*Id.* at *5.

The Seventh Circuit found that "[s]uch unexplained delays could support a deliberate indifference claim if [the prison physician] was aware of the severity of [the plaintiff's] condition." *Id.* The plaintiff satisfied his burden at the pleading stage by alleging that the prison physician was aware as early as his first appointment that the plaintiff had a severe hand injury. Moreover, the plaintiff alleged that the prison physician saw him on multiple occasions thereafter during the ten-month delay before surgery, during which he repeatedly complained of "ongoing symptoms (pain and discomfort, bleeding, swelling, and loss of functioning), which could support a finding that the delays in [the plaintiff's] treatment were unacceptable." *Id.* These allegations, liberally construed, were sufficient for the plaintiff's claim to survive. However, the court cautioned that the inference of deliberate indifference supported by the plaintiff's *pro se* allegations could be defeated if, following discovery, "a more complete examination of the facts" established that the prison physician "was not aware of the need for more urgent care, or that someone else was responsible for the alleged delays." *Id.* at *6.

Second, the court examined the plaintiff's claim that the prison physician was deliberately indifferent by allegedly ignoring the recommendations of the plaintiff's medical specialists without a medical reason for doing so. *See id.* at *5 ("Allegations that a prison official refused to follow the advice of a medical specialist for a non-medical reason may at times constitute deliberate indifference."). The plaintiff alleged that despite his medical specialists' recommendation that he either undergo surgery or be custom fitted for an immobilizing thumb "spica splint," *id.* at *2, the prison physician "allegedly ignored the recommendations, electing instead to wrap [his] wound in an Ace bandage." *Id.* at *5. Crucially, the court was able to infer that this decision was based on deliberate indifference, rather than reasoned medical judgment, because plaintiff alleged that the prison official made the "sarcastic statement" while administering the Ace bandage that "[t]hat's [your] thumb-splica [*sic*] splinter." *Id.* at **2, 6 (citing *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir.1997) (prison official's "sarcastic

9

responses" to prisoner's complaint "help raise a dispute about . . . defendants' knowledge of the condition, and [his] refusal to take steps to prevent it")). Again, however, the court noted that this inference could be defeated at the summary judgment stage. *See id.* at *6 ("We recognize that a more complete examination of the facts may show that [the plaintiff's] condition did not necessitate surgery or a splint . . . . It might also reveal that [the prison physician's] treatment plan fell within the specialists' recommendations or was based on his own legitimate medical judgment.").

Here, "a more complete examination of the facts" reveals that plaintiff has not raised a genuine dispute as to whether Dr. Dominguez and Dr. Funk were deliberately indifferent to his medical needs. First, with regard to the ten-month delay in treatment, the undisputed facts show that during the relevant time period, both Dr. Dominguez and Dr. Funk were attentive to plaintiff's complaints, exercised their medical judgment to diagnose and treat his injury, and were either "not aware of the need for more urgent care," or else "someone else was responsible for the alleged delays." *See id.* at *6.

During Dr. Dominguez's first meeting with plaintiff following the incident on August 2, 2011, she listened to his complaints, examined his wrist and arm, noted his pain and limited range of movement, opined that "it looked like a nice little sprain," [97-2] at 21, ordered x-rays to rule out a fracture, wrapped his wrist in an ACE bandage, prescribed ibuprofen, and directed plaintiff to keep his arm elevated. When the x-rays were reviewed and she saw plaintiff again on August 12th, she opined that plaintiff had a right ulnar tip dislocation and submitted a referral for him to obtain a referral from an outside specialist. After her referral request was denied, she ordered additional x-rays on August 24th and on September 9th referred him to Dr. Funk for a second opinion on the orthopedic referral "ASAP." [87-2] at 20. This referral resulted in plaintiff being seen by a series of independent orthopedic surgeons who diagnosed plaintiff with an arm fracture and planned for him to undergo reconstructive surgery. Between the time that Dr. Dominguez referred plaintiff to Dr. Funk on September 9, 2011 and when Dr. Meija performed surgery on May 12, 2012, she saw plaintiff on various occasions, addressed his complaints, and actively monitored his progress at UIC.

It is clear from these facts that Dr. Dominguez's treatment was not "so blatantly inappropriate as to evidence intentional mistreatment," *see Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), and the record does not support an inference that she was aware that he had a fracture necessitating urgent treatment prior to his September 27, 2011 appointment with Dr. Gabriel. While it is undisputed that Dr. Dominguez was initially incorrect about the source of plaintiff's symptoms, this at bests supports an inference of negligence, which does not constitute cruel and unusual punishment. *See Walker v. Benjamin*, 293 F.3d 1030, 1036-38 (7th Cir. 2002) (physician's medical decisions "may have been negligent" but this did not arise to deliberate indifference). Deliberate indifference can be inferred when a prison physician recklessly delays referring a patient to outside specialists for non-medically justified reasons. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (plaintiff stated a claim where he alleged he had "a serious medical condition and his pleas for treatment and medication were ignored for over ten

months while he suffered intense pain"). In contrast, the undisputed facts show that prior to plaintiff's diagnosis, Dr. Dominguez was at all times exercising her medical judgment to diagnose his injury, either by ordering imaging studies or by referring him to outside specialists for further evaluation. Because she was "not aware of the need for more urgent care," she was not deliberately indifferent. *See Perez*, 2015 WL 4092294, at *6.

Plaintiff nonetheless argues that there is a genuine dispute as to whether Dr. Dominguez caused and condoned the repeated delays involved in scheduling plaintiff's UIC appointments following his diagnosis, because of issues of fact "as to the amount of control" she had over his referral appointments. See [95] at 18. It is true that Dr. Dominguez was aware of plaintiff's ongoing pain and discomfort throughout his lengthy wait for surgery. However, it is undisputed that plaintiff's appointments were in fact scheduled by UIC based on the availability of its orthopedic surgeons. [96] at ¶ 71. Thus, at least in the first instance, "someone else was responsible for the alleged delays." *See id.* at *6; *see also Walker*, 293 F.3d at 1038 (summary judgment was appropriate where plaintiff claimed deliberate indifference on the part of prison physician regarding the delay between his treatment at the prison and his referral specialist because plaintiff "presented no evidence that these delays were even within [the prison physician's] control, much less that he was deliberately indifferent to [the plaintiff's] medical need"). Moreover, plaintiff's UIC treatment providers testified that his injury was no longer emergent and that he was timely scheduled for each subsequent appointment as any ordinary patient. *See* [88-1] at 9-10. In the light of an existing treatment plan by the specialists who had assumed responsibility for plaintiff's surgery, the record does not support a reasonable inference that Dr. Dominguez was deliberately indifferent by failing to actively disrupt his schedule or transfer him to a different outside facility and thereby replace his treatment providers.

The analysis is substantially similar as to Dr. Funk. Although Dr. Dominguez scheduled plaintiff for an appointment with him on September 22, 2011, Dr. Funk spoke about plaintiff with Warden Chandler on September 11th and rescheduled the appointment to September 12th. On that day, he examined plaintiff, reviewed his x-rays, requested an "urgent" referral to an outside orthopedic specialist, and approved a thirty-day lay in. He then participated in collegial review on September 13th and obtained approval for the referral. Thus, the record shows that prior to plaintiff's diagnosis, when the urgency of plaintiff's injury was still unclear, Dr. Funk acted to minimize, rather than exacerbate, the delays in plaintiff's treatment.

With regard to plaintiff's post-diagnosis care, the undisputed facts show that Dr. Funk's actions focused on approving the plans of the outside orthopedic specialists. Like Dr. Dominguez, he was not directly involved in scheduling the UIC appointments and thus "someone else was responsible for the alleged delays." *See id.* at *6. As with Dr. Dominguez, plaintiff argues that Dr. Funk was nonetheless deliberately indifferent by condoning the UIC scheduling delays, pointing to evidence that Dr. Funk was aware of and accepted the lengthy wait times. On January 9, 2012, Dr. Funk purportedly was told that plaintiff's next UIC appointment was not scheduled until mid-February and replied "that was gonna have to work." [101] at ¶ 18. Plaintiff also points to correspondence with Wexford risk management in which he complained of his lack

11

of treatment. In Wexford's January 12, 2012 response, based on information supplied by Dr. Funk, plaintiff was informed that he was going to be scheduled for a follow up in the near future.

Dr. Funk, like Dr. Dominguez, was not deliberately indifferent merely because he "condoned" the timing of appointments made by plaintiff's orthopedic treatment providers, who had determined his injury was non-emergent and scheduled him "like anyone else" in his situation. *See* [96] at ¶ 21. While plaintiff is understandably frustrated with the eight-month delay between Dr. Gabriel's recommendation and his surgery, much of this delay is attributable to an unforeseeable series of errors attributable to UIC. Thus, it does not give rise to a reasonable inference of deliberate indifference against Dr. Funk, who exercised his medical judgment in deferring to the orthopedic specialists' treatment plans.

Plaintiff also appears to suggest that Dr. Dominguez and Dr. Funk were deliberately indifferent because they imperfectly immobilized his injury with ACE wrap, when they should have used a more effective method such as a cast or splint. As noted, these allegations bear a superficial similarity to those found to state a claim of deliberate indifference in *Perez*. But several important differences make plaintiff's situation distinguishable.

First, this case is at the summary judgment stage, and plaintiff has not raised a genuine issue of disputed fact that complete immobilization of his injury was medically necessary. To support his argument, plaintiff points to the following deposition testimony from Dr. Chmell, Dr. Meija, and Dr. Funk. When asked whether "a cast or immobilization would have been useful" in plaintiff's case, Dr. Chmell responded that "[w]ell, it would have been useful in terms of alleviating the pain." [88-1] at 13. When asked whether "seeing Dr. Chmell constitutes treatment," Dr. Meija responded that "[i]n a semantic sense, yes. In a semantic – that's word play. He's being examined, if you have a fracture you'll need either immobilization, protected mobilization, surgery, some other actual treatment." [97-12] at 8. Later in his deposition, when asked "[i]s there any risk to walking around with a forearm broken in terms of no sling, no cast, nothing?" Dr. Meija responded "[i]t's a little speculative. I mean, you could – we immobilize fractures because the bone can cause further damage" *Id.* at 41. He also agreed that "there is some risk to not immobilizing a fracture[.]" *Id.* Finally, Dr. Funk testified that plaintiff's injury was "immobilized" with an ACE wrap on the upper extremity. [87-3] at 19. When asked if an ACE wrap "would be immobilizing his forearm," Dr. Funk responded that "[i]t would act to mobilize [sic], but it would not fully immobilize the area or the arm." *Id.* Dr. Funk was then asked "[w]ould a cast fully immobilize it?" and he responded "[a] cast would be also a form of immobilizing, yes. It would be more of a restrictive in that it would serve more to immobilize." *Id.*

The above testimony is insufficient to raise an inference of negligence, let alone deliberate indifference. There appears virtually no factual development of the issue, and plaintiff does not point to any portions of Dr. Chmell's or Dr. Meija's depositions in which they discussed the appropriateness of an ACE wrap, rather than a cast or splint, to immobilize his injury. Only Dr. Funk discussed the difference between an ACE wrap and other forms of immobilization, and

he did not discuss whether greater immobilization was medically necessary in this case, other than to generally testify that he met the standard of care at all times when treating plaintiff. [87-3] at 27. Moreover, there is no evidence that plaintiff's orthopedic specialists recommended a cast or disapproved of an ACE wrap. Dr. Gabriel's September 27, 2011 office note does not make a recommendation as to immobilization. [87-3] at 80. Dr. Chmell's November 21, 2011 office note states only that "we recommend he not weight bear with that upper extremity." [88-1] at 47-48. Dr. Meija's March 29, 2012 office note, despite mentioning that "[t]he patient has never had any calf casting or any immobilization or surgeries[,]" makes no recommendation of immobilization prior to his surgery. [97-12] at 68-69. Thus, unlike in *Perez*, where the plaintiff alleged that the prison physician ignored the specialists' recommendations of a splint for a non-medical reason, here there is no evidence that Dr. Dominguez or Dr. Funk acted contrary to plaintiff's specialists' recommendations or failed to exercise medical judgment in administering or ordering the ACE wraps.[3] *See Perez*, 2015 WL 4092294, at *6 (noting that an inference of deliberate indifference would be defeated if "a more complete examination of the facts" revealed "that [the prison physician's] treatment plan fell within the specialists' recommendations or was based on his own legitimate medical judgment"). As such, no reasonable inference of deliberate indifference arises out of Dr. Dominguez's and Dr. Funk's use of ACE wraps to immobilize plaintiff's injury.

For the foregoing reasons, plaintiff has not raised a genuine issue of material fact as to whether Dr. Dominguez or Dr. Funk were deliberately indifferent to his medical needs, and thus summary judgment in favor of Dr. Dominguez and Dr. Funk [86] is granted.

3. Wexford.

Plaintiff also contends that Wexford was deliberately indifferent to his medical needs. "In this circuit, a private corporation cannot be held liable under § 1983 unless it maintained an unconstitutional policy or custom." *Perez*, 2015 WL 4092294, at *7. A plaintiff may establish "municipal liability" against a private corporation by showing that the unconstitutional act complained of is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir.2010). "A plaintiff pursuing a 'practice or custom' theory of liability must show that policymakers were 'deliberately indifferent as to the known or obvious consequences' of that practice or custom. 'In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff.' Finally, the plaintiff must present evidence that this widespread custom or practice

---

[3]Plaintiff also notes that after Dr. Funk ordered an ACE wrap on September 29, 2011, there is a factual dispute as to whether plaintiff in fact received an ACE wrap. *See* [96] at ¶ 15. However, he does not dispute that Dr. Funk ordered the ACE wrap and does not suggest that the failure to administer the ACE wrap was the result of an official policy or practice. *See id.* Thus, no reasonable inference of deliberate indifference arises from this occurrence.

caused him a constitutional injury." *Ford v. Ghosh*, 2014 WL 4413871, at *10 (N.D. Ill. 2014) (quoting *Thomas*, 604 F.3d at 303). In any case, "a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation. In other words, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal quotations omitted).

In his briefs and Rule 56 statements and responses, plaintiff sets forth several theories of liability against Wexford. Plaintiff primarily focuses on the claim "that Wexford was well aware of and had a widespread practice and custom of tolerating, condoning or encouraging delays in referrals and acted with deliberate indifference to the known or obvious consequences of its practices." [95] at 20. Plaintiff contends that he has raised a genuine issue of material fact that "[d]espite Wexford's express policy that outside services be provided in a timely manner and its ability to seek other providers or intervene in scheduling if it chose, Wexford was aware of and condoned lengthy delays in appointments with outside specialists." *Id.* at 23. However, the alleged "widespread practice" of delaying referrals is not supported by the parties' statements of facts and responses.

As a preliminary matter, plaintiff makes a series of admissions that significantly narrow the scope of his claims. With regard to the initial delay between a physician's referral request and Wexford's decision, plaintiff does not dispute that when a physician makes a non-emergent referral, collegial review evaluates the referral "within a week of the time they are made, during a weekly scheduled call[,]" and that when a referral is urgent, "a provider can request an earlier appointment for a collegial review, subject to availability." [96] at ¶ 62. He does not dispute that when Dr. Funk requested an "urgent" referral, collegial review and approval occurred the following day. [96] at ¶¶ 19-20. With regard to referral denials, plaintiff does not dispute that Wexford's denial of Dr. Dominguez's first referral was based on the medical judgment of the collegial review physicians based on the medical evidence, rather than for the purposes of delay:

> **Defendant's Statement of Fact No. 16:** . . . . On August 16, 2011, Dr. Wahl discussed Plaintiff's case in collegial review. Dr. Dominguez was not involved in the collegial review. *Based on the totality of the medical evidence presented*, Wexford's collegial review board denied Dr. Dominguez's referral for the time being, and instead recommended conservative treatment for Plaintiff's wrist. . . .
>
> **Response:** Undisputed, except that the collegial review took place on August 15, 2011 and was recorded in Wexford's Authorization Tracking Logs on August 16, 2011.

[96] at ¶ 16 (internal record citations omitted) (emphasis supplied).

With regard to the delay between approvals and scheduling, plaintiff does not dispute that "[g]enerally, an appointment for off-site medical services is scheduled the same day Wexford approves the referral request for the off-site service." [96] at ¶ 71. Finally, with regard to the delay caused by appointment availability, plaintiff essentially concedes that appointments were

14

scheduled by the off-site facility in the first instance and Wexford's participation was largely restricted to monitoring those schedules:

> **Defendant's Statement of Fact No. 71:** With respect to scheduling inmate appointments at University of Illinois Chicago Hospital, a scheduler at UIC will schedule the inmate's appointment. UIC has a designated person who schedules inmate appoints [sic] at the hospital. A UIC employee directs and controls the scheduling of inmate appointments at UIC. The date of a prisoner's off-site appointment would be subject to the availability and the scheduling of the selected off-site provider. . . .
>
> **Response:** Undisputed, but the Utilization Management employees at Wexford assisted with scheduling appointments at UIC. They were involved in calling the UIC scheduler to determine when the patient is scheduled. Wexford provided UIC with a report of all the approved cases that needed to be scheduled there and had a good sense of what was going on in terms of appointments with the University of Illinois. Moreover, Dr. Funk has admitted when there was no appointment available from the usual off-site physicians, Wexford would seek to send inmates to another provider.

[96] at ¶ 71 (internal record citations omitted).

Given these concessions, the focus of plaintiff's claim appears to be that Wexford has a widespread practice of condoning lengthy scheduling appointments made by its off-site referral providers. In other words, rather than insisting on faster appointments or searching for speedier facilities, Wexford's practice is simply to accept whatever appointments its off-site providers schedule according to their own availability. This widespread practice, plaintiff argues, resulted in unconstitutionally lengthy delays for his treatment which caused him unnecessary pain. Plaintiff's claim is not implausible on its face. The Seventh Circuit has held that "[a] delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain. Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment. In some cases, even brief, unexplained delays in treatment may constitute deliberate indifference." *Perez*, 2015 WL 4092294, at **4, 8 ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference.") (internal quotations omitted). Thus, the court must evaluate whether plaintiff has raised a genuine issue of material fact as to whether Wexford's acquiescence to his various scheduling delays unnecessarily prolonged his pain based on the seriousness of his condition and the ease of providing treatment.

A significant portion of the scheduling delays occurred while plaintiff was waiting for various UIC appointments following Dr. Gabriel's diagnosis and recommendation for surgery. On October 4, 2011, Wexford approved plaintiff for a referral to a UIC hand specialist; UIC scheduled an appointment for November 21, 2011, a 48-day delay. *See* [96] at ¶¶ 28-29. On December 7, 2011, following plaintiff's appointment with Dr. Chmell, Wexford approved him for a referral to Dr. Meija; UIC scheduled an appointment for February 13, 2012, a 68-day delay.

15

*See* [96] at ¶ 33. On February 13, 2012, after UIC cancelled plaintiff's appointment with Dr. Meija, UIC rescheduled the appointment for April 5, 2012, which Wexford was able to reschedule to March 29, 2012, another 45-day delay. *See* [96] at ¶ 37. On April 4, 2012, Wexford approved Dr. Meija's plan for surgery; UIC scheduled the surgery for April 20, 2012 and then rescheduled for May 12, 2012, a 38-day delay. Thus, 199 days, or roughly six-and-a-half months of plaintiff's ten-month wait for surgery, can be attributed to waiting for UIC appointments.

While in the aggregate these delays could hardly be characterized as "brief," *see Perez*, 2015 WL 4092294, at *4, the total 199-day delay is in large part attributable to a series of errors by UIC which Wexford could not foresee at the time it approved each referral. When approving the initial November 21, 2011 UIC appointment, plaintiff's condition was known to be serious, but no longer emergent, and required a complicated surgery. Dr. Gabriel testified that the injury required a specialist and was no longer emergent. [96] at ¶¶ 23-24. Thus, the injury was not "readily treatable" and Wexford was subject to the availability of specialists for plaintiff's treatment. *See Perez*, 2015 WL 4092294, at *8. Dr. Chmell testified that it was reasonable for plaintiff's condition to be scheduled on an elective basis and that for any ordinary patient, inmate or not, "if you called and tried to make an appointment to see me or Dr. Meija, it'd probably be three or four months ahead of time. . . . I don't think there was any urgency." [88-1] at 9-10. There is evidence in the record that Wexford was aware that "the University of Illinois was known to have a long wait time to get an appointment[,]" *see* [90] at 22, but plaintiff has not claimed that the general existence of Wexford's referral relationship with UIC is in itself an unconstitutional policy. Under plaintiff's particular circumstances, it cannot be said that it was deliberately indifferent for Wexford to schedule a regular appointment with UIC in a manner that plaintiff's specialists testified was reasonable.

Because it was unforeseeable that UIC would assign plaintiff with a knee specialist rather than an upper extremity hand specialist, Wexford cannot be said to be deliberately indifferent for plaintiff's subsequent referral to Dr. Meija, which was scheduled within the "three or four months" period that Dr. Chmell testified was ordinary and reasonable. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 797 (7th Cir. 2014) (declining to infer deliberate indifference from mistaken referral where there was "no indication that [defendants] had any involvement in that mistaken referral, let alone that either one acted with deliberate indifference to [the plaintiff's] health in allowing the referral to go forward"). The same holds true for the rescheduled appointment after UIC cancelled plaintiff's appointment on the day he was taken to see Dr. Meija. Moreover, Dr. Chmell testified that the March 29, 2012 appointment with Dr. Meija represented good timing. [96] at ¶ 39. Finally, Dr. Meija testified that it was reasonable for plaintiff's surgery to be scheduled for April 20, 2012, and he suffered no harm as a result of the surgery being rescheduled to May 12, 2012. [96] at ¶¶ 43-44. Thus, each referral that Wexford approved represented ordinary and reasonable timing, according to plaintiff's specialists. And because Wexford could not foresee the future mistakes of third parties, there is no point at which it can be said to have been deliberately indifferent for failing to upset plaintiff's

16

treatment plan and seek new providers. Under these facts, there can be no reasonable inference of deliberate indifference against Wexford for the UIC delays.

The analysis is different with regard to pre-diagnosis delays. For a period of time following plaintiff's original injury, there is at least a genuine dispute that he could have been treated on an emergent and acute basis. As plaintiff points out in his response to defendants' statement of facts, by the time of his orthopedic referral, "Dr. Gabriel stated that the surgery would not need to be done on an emergent basis because it had already been over two months." [96] at ¶ 24. Dr. Gabriel testified that he could have treated the fracture on an acute basis if he saw it soon enough, but would have referred plaintiff to a UIC hand specialist after approximately one month to six weeks. *See* [88] at 15. Within this crucial pre-diagnosis period, plaintiff points to a number of "troubling delays in his treatment" from which a reasonable fact finder could infer deliberate indifference. *See Perez*, 2015 WL 4092294, at \*\*5-7 (plaintiff stated a claim for deliberate indifference where he alleged that delays prevented specialist from treating plaintiff's injury on an acute basis, thus prolonging his pain while he waited for follow-up surgery).

First, plaintiff points to a factual dispute as to when his injury occurred and when he initially sought treatment. According to plaintiff's testimony, he was injured on July 11, 2011. [101] at ¶¶ 9-10. On July 12, 2011, he asked an officer and his supervisor to take him to the healthcare service for treatment, but was told he would need to sign up for sick call. [97-2] at 7-8; [101] at ¶ 1. After going to sick call on July 13, 2011, he was seen by Nurse Cady, who agreed that he had a serious injury and attempted to have him seen by a physician. [97-2] at 18. However, because the healthcare service was short-staffed for the day (plaintiff's testimony suggests that she told him physicians or staff were on vacation), she simply put him on a list to be seen by a physician in the future. On August 1, 2011, plaintiff returned to sick call, was recognized by Nurse Cady, and was finally scheduled to see Dr. Dominguez on August 2, 2011. Construing this factual dispute in favor of plaintiff, as the court is required to do, there was a 20-day delay between the time plaintiff initially presented to sick call, with what Nurse Cady agreed was an obviously serious injury, and when he was ultimately seen by a physician. This delay, accepting plaintiff's testimony as true, was attributable to a staffing shortage rather than a legitimate medical reason. Analogously, in *Perez* the Seventh Circuit found that an allegation "that Wexford maintained a policy or practice of not having a full-time doctor stationed at the prison at all times" stated a claim for deliberate indifference against Wexford because it was "capable of causing delays in treatment . . . which could result in a constitutional deprivation[.]" *See Perez*, 2015 WL 4092294, at \*7.

Second, the parties' statements of facts and supporting attachments reveal that after Dr. Dominguez ordered x-rays on August 2, 2011, no Wexford physician reviewed the results until August 10, 2011, despite a report being completed by an outside radiology group on August 3, 2011. Dr. Dominguez testified that Wexford's policy at the time was that "the medical director got all the x-rays and lab reports" which could at times cause delays in treatment if the medical director was unavailable on the day that the x-ray results became available. [87-2] at 15. The

17

Seventh Circuit has held that delays related to x-rays do not necessarily constitute deliberate indifference. *See, e.g. Davis v. Samalio*, 286 F. App'x. 325, 328 (7th Cir. 2008) (prison officials were not liable for eight-day delay in procuring second round of x-rays where there was no evidence that the delay was a product of deliberate indifference on the part of the officials). Construing the immediate facts in the light most favorable to plaintiff, however, the 7-day delay in reading the already prepared x-ray report can be attributed to an express Wexford policy which a Wexford physician testified could cause unnecessary delays in treatment.

Finally, as part of his claim that Wexford had a widespread practice of condoning scheduling delays, plaintiff points to the 14-day delay between September 13, 2011, when Wexford approved Dr. Funk's "urgent" orthopedic referral, and plaintiff's actual appointment with Dr. Gabriel on September 17, 2011. This multi-week waiting period occurred during a time when it was still unclear whether plaintiff's condition could be treated on an emergent basis. Analogously, in *Perez*, the Seventh Circuit found that a plaintiff stated a claim for deliberate indifference where he had to wait four days between his prison physician's realization that his injury "required the care of a specialist" and the referral itself, at which time the injury could no longer be treated acutely. *See Perez*, 2015 WL 4092294, at *7. However, the analysis does not end there. While the court finds that there is a genuine dispute as to whether this delay was unconstitutionally lengthy in light of plaintiff's circumstances, it is nonetheless a close question whether plaintiff has set forth sufficient evidence to infer a widespread practice of condoning scheduling delays. The Seventh Circuit has cautioned that, at the summary judgment stage, "isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [the plaintiff's] needs." *Shields*, 746 F.3d at 796. On the one hand, plaintiff claims a widespread practice by pointing to this occurrence as one of several incidents in which Wexford condoned lengthy wait times scheduled by outside providers. On the other hand, this is the only act of "condoning" a scheduling delay that the court finds was arguably unconstitutional as applied to plaintiff's circumstances. Plaintiff's contention that all the scheduling delays were unconstitutional may explain why there appears to have been little discovery as to whether this multiple-week delay for an "urgent" referral was part of a wider pattern or practice. In light of the court's findings, plaintiff may seek leave to reopen discovery on this limited basis and thus summary judgment on this issue would, at this time, be premature.

Thus, plaintiff has pointed to a series of delays, totaling 41 days, which were arguably attributable to Wexford's deliberately indifferent policies and practices. The Seventh Circuit has held that a prisoner who complains that a delay in treatment was deliberately indifferent must point to some medical evidence in the record that the delay was detrimental. *See Walker*, 293 F.3d at 1038 (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir.1996)); *see also Davis*, 286 F. App'x. at 328 (plaintiff presented no evidence that delay in procuring x-rays caused him harm). Here, under plaintiff's version of the facts, he waited 78 days after his July 11th injury before finally being seen by Dr. Gabriel on September 27th. He has identified a factual dispute as to whether as much as 41 of those days were attributable to Wexford's deliberately indifferent policies and practices, including failure to maintain adequate staffing levels during sick call, a

18

policy of requiring the medical director to review all x-ray reports, and a practice of condoning multi-week delays for urgent referrals. Under *Perez*, it is sufficient that these delays were directly responsible for 41 days of unnecessary prolonged pain and suffering. *Perez*, 2015 WL 4092294, at *4 ("In some cases, even brief, unexplained delays in treatment may constitute deliberate indifference.") (citing *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir.1996) ("whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating" presented question for jury)). Perhaps even more importantly, the remaining 37 days are within the month-to-six-weeks period that Dr. Gabriel testified was the outside range in which he might still have been able to treat the injury on an acute basis; this raises the possibility that absent Wexford's policies and practices, plaintiff could have avoided the seven-and-a-half month delay and prolonged pain, discomfort, and disability between Dr. Gabriel's diagnosis and his surgery.[4]

Because plaintiff has raised a genuine issue of fact as to whether Wexford's policies and practices caused "unacceptable" delays which both directly prolonged his pain and potentially precluded Dr. Gabriel from treating plaintiff on an acute and emergent basis, defendants' motion for summary judgment [86] is denied with regard to his claims against Wexford pertaining to pre-diagnosis delays. *See Perez*, 2015 WL 4092294, at *5. Plaintiff has failed to raise a genuine issue of material fact as to the remainder of his claims against Wexford, Dr. Dominguez, and Dr. Funk, and defendants' motion for summary judgment [86] is granted with respect to those claims. The parties are directed to contact Magistrate Judge Iain Johnston's chambers by August 24, 2015 to arrange for a settlement conference with regard to the remaining claims.

Date: 7/28/2015               ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices.  (LC)

---

[4]Plaintiff also points to testimony from Dr. Meija that the continued numbness he suffered after his injury could potentially have been related to the lengthy delay between the injury and surgery. *See* [96] at ¶¶ 45-54; [101] at ¶¶ 27-33. While not dispositive, this raises a further factual dispute as to the impact that the delay had on plaintiff's injury and recovery.